```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
                                                    │ DOCUMENT                    │
                                                    │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT                        │ DOC #:                      │
SOUTHERN DISTRICT OF NEW YORK                       │ DATE FILED:  8/7/14         │
                                                    └─────────────────────────────┘
-----------------------------------------------------------------X
```

YVETTE RAY,                                        :
                                                   :
                                                   :   **REPORT AND**
        Plaintiff,     :   **RECOMMENDATION**
                                                   :
  -v.-                                   :   No. 13-CV-6595 (LTS) (JLC)
                                                   :
CAROLYN W. COLVIN, Acting Commissioner             :
of Social Security,                                :
        Defendant.     :
-----------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Laura Taylor Swain, United States District Judge:**

      Plaintiff Yvette Ray brings this action seeking judicial review of a final determination by

Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

Ray's application for Social Security Disability ("SSD") benefits. The parties have cross-moved

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons

set forth below, I recommend that the Commissioner's motion be denied and that Ray's motion

be granted to the extent that the case be remanded for further proceedings.

## I. BACKGROUND

### A. Procedural History

      Ray filed her application for SSD benefits on May 4, 2011, alleging that she had been

disabled since February 4, 2011. Administrative Record ("Rec.") (Dkt. No. 7), at 93-94. After

the Social Security Administration ("SSA") denied her application on August 5, 2011, Ray

requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 60-64. Represented by

counsel, Ray appeared at a hearing held before ALJ Selwyn S.C. Walters on May 22, 2012. Id.

at 29-57. After the hearing, ALJ Walters denied Ray's claims in a written decision dated August

10, 2012, finding that she was not disabled. Id. at 14-25. The ALJ's determination became the

Commissioner's final decision when the SSA Appeals Council denied Ray's request for review on July 25, 2013. Id. at 1-3.

The current action was timely commenced on September 18, 2013, when Ray, represented by counsel, filed a complaint seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). Complaint ("Compl.") (Dkt. No. 1). The Commissioner filed her Answer on December 17, 2013 (Dkt. No. 6). On February 7, 2014, Ray moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, requesting that the Court vacate and reverse the decision of the Commissioner. Motion for Judgment on the Pleadings (Dkt. No. 11); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem.") (Dkt. No. 12). On March 14, 2014, the Commissioner cross-moved for judgment on the pleadings. Cross-Motion for Judgment on the Pleadings (Dkt. No. 14); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Gov't Mem.") (Dkt. No. 15)). Ray filed a reply memorandum on April 4, 2014. Reply Memorandum of Law ("Pl. Reply") (Dkt. No. 18).[1]

## B. The Administrative Record

### 1. Ray's Background

Ray was born on June 21, 1964 and at the time of her application for SSD benefits was 46 years old. Rec. at 111. She attended school until the eighth or ninth grade. Id. at 44, 116.

---

[1]     The Court notes that the parties disregarded the directions of its December 20, 2013 Scheduling Order (Dkt. No. 8), which required that Ray submit a numbered statement of relevant facts, to which the Commissioner was to file a responsive document. The purpose of these submissions, as the Scheduling Order noted, was to create a streamlined process by allowing the parties to stipulate to non-controverted facts while identifying only those facts relevant to adjudication of the motions. Although the Court will consider the pending motions on the basis of the submitted memoranda of law alone, the parties are admonished for their failure to comply with a court order.

Ray is unmarried and currently resides in a Bronx apartment that she shares with her elderly mother. Id. at 34, 114. Ray's last employment, which ended on February 4, 2011, was a full-time position as a machine worker at Empire Book Binding. Id. at 115-16, 123. Prior to starting that position in 2009, Ray was employed as a machine worker at two different book binderies between 2002 and 2009. Id. at 23. From 2001 to 2002, she was employed as a temporary factory worker at Active Agency and, from 1997 to 2001, as a "table worker" at Craft Bindery. Id. According to Ray, she has not worked since February 2011 due to an increase in pain that she can "barely deal with" and that "knocks [her] down to the floor." Id. at 45, 115. Specifically, Ray indicates that she suffers from lower back pain. Id. at 37, 40.

In terms of daily activities, Ray cooks for herself and does not receive help with household chores. Id. at 137-38. Ray is responsible for her personal hygiene. Id. at 136-37. She also cares for her mother by taking her to appointments, feeding her, checking her sugar level, and assisting with her oxygen. Id. at 55. Ray is able to shop for groceries and clothing. Id. at 139. However, she does not socialize aside from going to church every Sunday for approximately 45 minutes. Id. at 35.

Ray has alleged that she became disabled and unable to work due to the following conditions: her HIV-positive status, numbness in her hands, anemia, Raynaud's disease,[2] neuropathy, chronic sinusitis, asthma, and being chronically underweight. Id. at 115. On May 24, 2011, Ray went to Gouverneur Diagnostic and Treatment Center ("GDTC") to request help completing disability paperwork and indicated that she had "been on unemployment after [her]

---

[2]     The parties provide the same definition of Raynaud's disease (alternatively referred to as a syndrome or disorder): "a rare disorder that affects the arteries," causing a narrowing of the blood vessels and reducing blood flow to the fingers and toes. Pl. Mem., 5 n.2; Gov't Mem., 4 n.2 (citations omitted).

job folded since February 2011." Id. at 207. On her disability report, however, Ray stated that the reason she stopped working was that she "fell on snow and ice and fractured my thumb, and broke my wrist." Id. at 115.

According to Ray, she is unable to lift objects due to a back injury, back pain, and joint pain. Id. at 140. She is able to walk four to five blocks before having to rest for ten to fifteen minutes. Id. at 142. Ray attributes her inability to walk for extended time periods to "tiredness, pain and calluses." Id. at 141. A doctor prescribed orthotics for Ray, which she wears all the time. Id. at 142. Ray is able to sit but experiences lower back pain if she sits for "too long." Id. at 141. Ray reports no problems climbing stairs but has "some problem with [her] back" when kneeling, squatting, and reaching. Id. Ray suffers from numbness in her right hand and wrist, which she attributes to a 2006 diagnosis of tenosynovitis. Id.

Ray sometimes has trouble paying attention and reports difficulty following both written and spoken instructions. Id. at 142. Stress and changes in schedule affect her ability to focus and concentrate. Id. at 143. At the time of her disability application, Ray also indicated that she suffered from "recent short term memory lost (2-3 days)." Id.

Finally, Ray reports that she experiences asthma attacks lasting 30 minutes during which she is unable to breathe and gasps for air, requiring treatment with an inhaler and nebulizer. Id. at 144. While she was working, she suffered two attacks per month. Id. at 143. Ray identifies cold air, dust, and respiratory infection as triggers of her asthma attacks and reports that they usually occur in the winter or spring. Id. at 143-44. The frequency of Ray's asthma attacks has decreased since she stopped working. Id. at 144.

4

### 2. Administrative Proceedings

#### a.    Application for Disability and Related Reports

Multiple reports were completed in connection with Ray's application for SSD benefits: a disability report compiled by the SSA field office on May 6, 2011, id. at 111-13; an undated disability report, id. at 114-20; a function report, including an asthma questionnaire, signed by Ray on May 29, 2011, id. at 135-44; a work history report signed by Ray on May 24, 2011, id. at 121-30; and an undated disability report appeal, id. at 145-51.  In addition, Ray completed lists of her recent medical treatment, id. at 152-53; medications, id. at 154-55; and work background, id. at 156-58, all dated October 4, 2011.

In the May 6, 2011 field office disability report, the SSA employee who met with Ray observed that she "was very calm in the interview" and "appeared very weak." Id. at 112.  In the undated disability report, Ray indicated that she was 5 foot 4 inches tall and weighed 101 pounds.  Id. at 115.  Ray also summarized the physical and mental conditions limiting her ability to work, her job history, and past medical treatment.  Id. at 114-20.  Similarly, in the function report, Ray described her daily activities, mobility, asthma symptoms, and physical and mental capacities.  Id. at 131-144.  In the undated disability report appeal, Ray provided an update on her activities, indicating that "due to pain and numbness in my right side, it is difficult to move my arm around." Id. at 149.  Additionally, Ray reported decreased mobility since her initial disability application, describing her inability to "walk more than 1 to 2 blocks before feeling pain in my legs and foot.  I can also not stand for any length of time." Id.  The "recent medical treatment" report submitted by Ray summarized medical treatments and assessments she had received since the first disability report.  Id. at 152.

## b.   Relevant Medical Evidence

### i.   Records Prior to Application for Benefits

According to Ray's medical records, she received treatment for Raynaud's disease as early as and throughout 2010. On March 18, 2010, she met with Dr. Karen Hoover at GDTC and was put on Nifedipine to control the condition, although Ray was "weaning off" the medication as the "weather gets warmer." Id. at 221. During a September 16, 2010 visit with Dr. Hoover, Ray "complained of a new onset [of] numbness in finger tips [and] three toes." Id. at 231. On September 30, 2010, Ray reported continuing numbness in her toes but none in her hands, and Hoover noted that Ray would start taking Nifedipine the following week due to anticipated cold temperatures. Id. at 232. On December 9, 2010, Hoover recorded that the Raynaud's disease was "worsening in cold weather" despite measures taken by Ray to protect her hands and feet from the cold; at the same time, Ray reported that her hands and feet "do not become severely cold or painful." Id. at 233. On August 9, 2010, Ray went to Bellevue Hospital Center ("Bellevue") complaining of "numbness of [the] 3rd and 4th finger in the cold weather" and "tingling in the summer months." Id. at 172. At a follow-up appointment, Ray was "referred for evaluation for vascular insufficiency," and on November 15, 2010 was again diagnosed with Raynaud's disease. Id. at 173-74.

The record indicates that Hoover also treated Ray on a regular basis to manage her HIV-positive status. During a March 18, 2010 consultation, Hoover noted that Ray was HIV-positive and asymptomatic. Id. at 221. On April 1, 2010, Hoover again saw Ray and, reviewing Ray's lab results, indicated they were "excellent" and "very stable." Id. at 223. Hoover also noted that Ray felt well, was taking her medications "100 % of the time," and worked seven hours a day. Id. Medical reports following an ophthalmology examination on April 12, 2010 and a

6

gynecological examination on April 22, 2010 indicated that Ray was asymptomatic of HIV. Id. at 196, 239. Subsequent appointments with Hoover on September 16 and December 9, 2010, as well as a "HIV Therapeutic Visit" on May 24, 2011, continued to show the same result. Id. at 207, 232-33.

Finally, in a letter dated April 19, 2011, Dr. Hoover indicated that in addition to her other diagnoses, Ray "has failed to gain notable weight" since she started seeing Hoover, with a body mass index ("BMI") that "fluctuates between 17 and 18." Id. at 181. On March 11, 2009, Ray's BMI was recorded as 17.61 at a gynecological examination at GDTC. Id. at 197. On April 22, 2010, Ray was described as underweight and her BMI was recorded at 18.30. Id. at 194. Hoover noted that Ray had "poor weight gain" on September 16, 2010, resulting in Ray losing two pounds despite no change in eating habits. Id. at 231. When Ray returned to Hoover on September 30, 2010, complaining of a cold that required her to miss four days of work, Hoover found that, since September 16, Ray had lost more weight, which was attributed to her poor appetite during her cold. Id. at 232. To combat the weight loss, Dr. Hoover "[p]ut in for [a] nutritional supplement." Id. On December 9, 2010, Hoover found that Ray had gained a small amount of weight and indicated that she would procure Boost for the patient. Id.

### ii.   Consultative Medical Examination

On June 22, 2011, Ray was examined by Dr. Sharon Revan after being referred by the SSA's Division of Disability Determination. Id. at 217-20. Revan listed Ray's chief complaints as "asthma, Raynaud's, and HIV." Id. at 217. Revan noted that Ray had been diagnosed with Raynaud's disease since 2001 and that it occurs only in the winter, her hands becoming numb and pale due to poor circulation. Id. Revan added that Ray "denies any pain." Id. In discussing Ray's HIV diagnosis, Revan indicated that Ray complained of fatigue and weakness and that she

had "a weight loss of 10 pounds over the last 10 years." Id. Revan's physical examination found Ray to be 64 inches tall and weigh 100 pounds. Id. at 218. Revan noted that Ray had had asthma since age 16, that it is "worse with change in weather, the heat, and dust" but "better with [Ray's] inhaler and nebulizer." Id. at 217. Ray complained of shortness of breath after walking six to seven blocks. Id. Revan noted that Ray had been to the emergency room twice for asthma since her diagnosis, but that she had never needed to be intubated. Id.

Based on the above medical history and physical examination, Revan gave Ray a "fair" prognosis. Id. at 220. Revan concluded that there were no limitations with respect to speech, vision, hearing, motor activity in the upper extremities, and grooming. Id. However, Revan did find "mild limitations with walking distances due to shortness of breath" and limitations to sitting and standing due to back pain. Id.

### iii.   Physical Residual Functional Capacity Assessment

On August 3, 2011, a physical Residual Functional Capacity ("RFC") assessment was completed for Ray based on a review of the medical records in her file. Id. at 242-43. After summarizing the medical evidence discussed above, the author of the assessment checked a box indicating that Ray had no postural limitations, manipulative limitations, nor any visual limitations. Id. at 243-44.  The assessment also indicated that Ray needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Id. at 244-45.

### c.   Hearing Before the ALJ

ALJ Walters held a hearing on May 22, 2012 to consider Ray's eligibility to receive SSD benefits. Id. at 29-57. Ray was represented by counsel at the hearing. After the ALJ introduced the medical evidence into the record, Ray's attorney, Christopher Bowes, Esq., gave an opening statement during which he highlighted Ray's HIV-positive status, Raynaud's disease, and fatigue

as the basis of her disability claim. Id. at 31-33. The ALJ questioned Ray about her HIV diagnosis and treatment, her Raynaud's-related symptoms, lower back pain, history of being chronically underweight, foot neuropathy, chronic sinusitis, and asthma. Id. at 36-42. Ray reported that although she had recently gained weight and was now 125 pounds, in October or November of 2011 she had weighed 103 or 104 pounds. Id. at 40-41. The ALJ also inquired about Ray's daily activities, ability to complete household tasks, and asked a few questions about Ray's education and work history. Id. at 35-36, 43-45. Finally, the ALJ asked Ray to explain why she was unable to return to work. Id. at 45. Ray responded by describing a recent, "very strong" increase in pain that "knock[s her] down to the floor." Id.

During the ALJ's questioning, Ray identified Dr. Hoover as her treating physician. Id. at 39. When the ALJ began to state, "You get all your medical care . . . ," Ray responded immediately, "Only from her," referring to Hoover. Id. at 39-40. In addition, when the ALJ questioned Ray about her neuropathy treatment, Ray indicated that she was not seen by her "primary doctor," but instead by a "foot doctor" at GDTC. Id. at 41-42.

After the ALJ completed his examination, Bowes questioned Ray about her foot deformity and its impact on her ability to walk and stand. Id. at 45-48. Bowes elicited testimony from Ray about the accommodations provided by her employer related to her Raynaud's disease. Id. at 50-51. Ray explained that, during the winter, her entire hand becomes numb and she had to wait two hours before blood circulation returns and she could resume work at the book bindery. Id. She added that medication lessens the duration of the numbness. Id. at 51. Finally, when Bowes asked Ray about her daily activities Ray explained that she did not go out much and that she cared for her mother by taking her to appointments, preparing meals, and keeping track of her medical conditions. Id. at 54-55.

9

At the conclusion of the hearing, Bowes explained to the ALJ that he had commenced work on Ray's case only three weeks earlier. Id. at. 56. Bowes stated that he had not been able to get records from Dr. Hoover and suggested that it would be helpful to have a statement from Hoover as Ray's primary care physician about Ray's HIV-management, with which the ALJ agreed. Id. To have time to obtain this additional documentation, Bowes requested until the second week of June 2012 to submit it into the record, which was granted. Id. at 57. However, it does not appear that any further documents were added to supplement the record after the hearing.

## II.   DISCUSSION

### A. Standard of Review

#### 1.   Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation mars and alterations omitted). In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian, 708 F.3d at 417 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court

may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" Kirkland v. Astrue, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting Butts, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," Brault v. Soc. Sec. Admin., 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." DeJesus v. Astrue, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise." Brault, 683 F.3d at 448 (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**2.  Commissioner's Determination of Disability**

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

11

In assessing whether a claimant's impairments meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that the Social Security Act is a remedial statute, to be broadly construed and liberally applied." Mongeur, 722 F.2d at 1037 (citation omitted); see also Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must ultimately take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur, 722 F.2d at 1037 (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. Cichocki v. Astrue, 729 F.3d 172, 173 n.l (2d Cir. 2013) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the Commissioner will find the claimant disabled.  Id.; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues on to the fourth step, determining whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any

12

other work.  20 C.F.R. § 404.1520(a)(4)(v).

      The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  Ordinarily, the Commissioner satisfies this by relying on the applicable medical vocational guidelines. See Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citing Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  Known as the "Grids," these guidelines "take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience" to provide a determination as to an applicant's capacity for work.  Id. (citation omitted).  However, when the claimant suffers from nonexertional impairments, "exclusive reliance on the Grids is inappropriate." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 421 (S.D.N.Y. 2010) (citing Butts, 388 F.3d at 383).  "Limitations or restrictions which affect a claimant's ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional."  Id. at n.47 (citing 20 C.F.R. § 404.1569a(c)(1)(i)(vi)); see also Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (where restrictions "limit the range of sedentary work that the claimant can perform the ALJ may be precluded from relying exclusively on the Grids").  When such nonexertional impairments are present, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"  Id. (quoting Bapp, 802 F.2d at 603).  Nonetheless, the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines."  Zabala v. Astrue,

595 F.3d 402, 410-11 (2d Cir. 2010) (citation omitted).  Instead, the vocational expert must be

called upon where the limitation involved results in "an additional loss of work capacity . . . that

so narrows a claimant's possible range of work as to deprive him of a meaningful employment

opportunity."  Bapp, 802 F.2d at 603.

### b.   Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  Sims v. Apfel,

530 U.S. 103, 110-11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial,

must on behalf of all claimants . . . affirmatively develop the record in light of the essentially

non-adversarial nature of a benefits proceeding."  Moran v. Astrue, 569 F.3d 108, 112 (2d

Cir.2009) (internal quotation marks and citation omitted).  As part of this duty, the ALJ must

"investigate the facts and develop the argument both for and against granting benefits."  Sims,

530 U.S. at 111.  Specifically, under the applicable regulations, in making a disability

determination, the ALJ is required to develop a claimant's complete medical history.  Pratts v.

Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).  This responsibility

"encompasses not only the duty to obtain a claimant's medical records and reports but also the

duty to question the claimant adequately about any subjective complaints and the impact of the

claimant's impairments on the claimant's functional capacity."  Pena v. Astrue, No. 07 Civ.

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citing Cruz v. Sullivan, 912

F.2d 8, 11-12 (2d Cir. 1990)).

Whether the ALJ has met his duty to develop the record is a threshold question.  Indeed,

before reviewing whether the Commissioner's final decision is supported by substantial evidence

under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a

full hearing under the Secretary's regulations' and also fully and completely developed the

14

administrative record." Scott v. Astrue, No. 09 Civ. 3999 (KAM), 2010 WL 2736879, at * 12

(E.D.N.Y. July 9, 2010) (quoting Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751,

755 (2d Cir.1982)); see also Rodriguez v. Barnhart, No. 02 Civ. 5782 (FB), 2003 WL 22709204,

at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a

bedrock principle of Social Security law.") (citing Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999)).

This imperative remains in force even where the claimant is represented by counsel. Perez, 77

F.3d at 47.

        **c.**    **Treating Physician's Rule and Weight Afforded to Medical Evidence**

     "Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled." Pena ex rel. E.R. v. Astrue, No. 11 Civ. 1787 (KAM), 2013 WL

1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted) (citing 20 C.F.R.

§§ 404.1527(d), 416.927(d)). However, a treating physician's opinion is given controlling

weight – that is, it is binding – provided the opinion as to the nature and severity of an

impairment "is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record." 20

C.F.R. §§ 404.1527(c)(2); see Selian, 708 F.3d at 418 ("The opinion of a treating physician on

the nature or severity of a claimant's impairments is binding if it is supported by medical

evidence and not contradicted by substantial evidence in the record.") (citing Burgess, 537 F.3d

at 128 and Green-Younger v. Barnhart, 335 F.3d 99, 106-07 (2d Cir. 2003)). The regulations

define a treating source as the claimant's "own physician, psychologist, or other acceptable

medical source who provides [the claimant] . . . with medical treatment or evaluation and who

has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

Deference to such a medical source is appropriate because "these sources are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of [the] medical

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2).

Under certain circumstances, however, a treating physician's opinion will not be controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. Guzman v. Astrue, No. 09 Civ. 3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(l), 416.927(e)(l)); accord Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." Pena ex rel. E.R., 2013 WL 1210932, at *15 (quoting Halloran, 362 F.3d at 32) (internal quotation marks omitted) (alteration in original); see also Snell, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." Selian, 708 F.3d at 420 (quoting Burgess, 537 F.3d at 129); see Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the

final determination." <u>Lacava v. Astrue</u>, No. 11 Civ. 7727 (WHP) (SN), 2012 WL 6621731, at

*13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), <u>report</u>

<u>and recommendation adopted</u>, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

 To determine how much weight a treating physician's opinion should carry, the ALJ must

consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment
> relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv) whether the opinion is from a
> specialist; and (v) other factors brought to the Social Security Administration's attention
> that tend to support or contradict the opinion.

<u>Halloran</u>, 362 F.3d at 32 (citation omitted); <u>see</u> 20 C.F.R. § 404.1527(c)(2).  If, based on these

considerations, the ALJ declines to give controlling weight to the treating physician's opinion,

the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source.  <u>Halloran</u>, 362 F.3d at 33; <u>accord</u> <u>Snell</u>, 177 F.3d at 133 (responsibility of

determining weight to be afforded does not 'exempt administrative decisionmakers from their

obligation . . . to explain why a treating physician's opinions are not being credited")

(referencing <u>Schaal</u>, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).[3]  The regulations require

that the SSA "always give good reasons in [its] notice of determination or decision for the

weight" given to the treating physician.  <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to

remand [cases] when the Commissioner has not provided good reasons."  <u>Pena ex rel. E.R.</u>, 2013

WL 1210932, at *15 (quoting <u>Halloran</u>, 362 F.3d at 33) (second and third alteration in original)

(internal quotation marks omitted).

---

[3] On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified.  The section that
described the factors for an ALJ to consider when deciding how to weigh a treating physician's
opinion was moved from subsection (d)(2) to (c)(2).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." Galiotti v. Astrue, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." Galiotti, 266 F. App'x at 67 (quoting Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002)).

## B. Analysis

### 1. The ALJ's Decision

ALJ Walters issued his decision on August 10, 2012, denying Ray's claim for SSD benefits. Rec. at 14-25. Applying the five-step inquiry on disability, the ALJ first determined that Ray had not been engaged in substantial gainful activity since February 4, 2011, the date of the alleged onset of disability. Id. at 14. At step two, the ALJ found that Ray had the following severe impairments: HIV infection, Raynaud's disease, and asthma. Id. at 24.

### a. Findings that Ray did not Meet Criteria for Qualifying Impairments

At step three, the ALJ concluded that Ray's medical problems did not meet or equal the criteria for any impairment recognized in the SSA's listings. Id. at 15, 24. The ALJ relied primarily on the results of Ray's June 22, 2011 consultative examination and her medical records retrieved from both Bellevue and GDTC. Id. at 15-23. Running through the list of medical problems cited by Ray, the ALJ found that the evidence did not support a finding that Ray was persistently limited by, or received regular treatment for: neuropathy/pain in the extremities, id. at 16; tenosynovitis, id. at 17; bone fractures in the wrist, id. at 18; low back pain, id. at 18-19;

leg/foot pain and swelling, id. at 19-20; sinusitis, id. at 21; fatigue, id.; and, anemia, id. at 22.[4]
Furthermore, the ALJ observed more generally that "Ray's medical problems do not
significantly interfere with her ability to perform personal care and daily living activities." Id. at
23.

> ### i.   HIV Status and Weight

With respect to Ray's HIV infection, the ALJ concluded that there was no evidence that
Ray suffered "persistent HIV-related symptoms" which would preclude her from "performing
light work activity." Id. at 15.  To support this conclusion, the ALJ noted that medical records
from 2009 on revealed that Ray had an undetectable viral load and was asymptomatic. Id. at 15-
16.  Although the ALJ acknowledged that the "record indicates that [] Ray has a history of being
chronically underweight with poor weight gain [and] weight loss," he found that the Bellevue
and GDTC records "do not reveal that Ray has a history of significant weight loss/wasting
syndrome." Id. at 16. The ALJ added that Ray had told the consultative examiner in June 2011
that she had lost ten pounds over the previous ten years and that, at the May 22, 2012 hearing,
Ray had testified that she had "gained some weight." Id.  Relying again on the consultative
examination, the ALJ underscored the examiner's conclusion that Ray "does not have any HIV-
related limitations." Id.

> ### ii.   Raynaud's Disease

The ALJ found that there was "no documentation in the record of an impairment,"
stemming from Raynaud's disease, "which would preclude Ms. Ray from performing light work
activity." Id. at 17. Although the Bellevue and GDTC evidence indicated that the condition
affected her fingers and toes with some degree of numbness in cold weather, the ALJ concluded

---

[4]      Ray does not challenge the ALJ's findings that these limitations did not constitute
qualifying impairments.

there was no "history of debilitating Raynaud's disease-related symptoms." Id. The ALJ relied

on the June 2011 consultative examination, which "yielded unremarkable results except for

evidence of limping on the right and an inability to toe walk" and Ray's denial of any hand pain.

Id.

### iii.   Asthma

Acknowledging that Ray's asthma since age 16 was indicated throughout her medical

records, asthma questionnaire, and the findings of the consultative examination, the ALJ

nonetheless concluded that Ray was capable of "performing light work activity, which does not

require exposure to respiratory irritants or temperature or humidity extremes." Id. at 20.[5]  He

noted that, while experiencing two asthma attacks per month, Ray had not received any inpatient

treatment over the past year, had only received emergency room treatment twice since her

diagnosis, and could manage the condition with an inhaler and nebulizer. Id. at 20-21.  Finally,

the ALJ found that Ray's limitations in walking and exertion were mild according to the

consultative examiner. Id. at 21.

### b.   Findings that Ray Retained Functional Capacity to Perform Light Work and Is Capable of Performing Other Work

Moving on to step four, the ALJ found that, while her disabilities did not qualify as listed

impairments, the record indicated that Ray was nonetheless "unable to perform her past relevant

work" as a machine worker in the bookbinding industry. Id. at 23.  Thus, the ALJ continued to

the fifth and final step of the disability analysis and, without the assistance of a vocational expert,

applied the medical vocational guidelines, specifically Rule 202.18 of Table 2, Appendix II to

Subpart P of Regulation No. 4. Id. at 24.  The ALJ thereby concluded that Ray "retains the

---

[5]      Ray does not challenge the ALJ's underlying determination that her asthma does not
qualify as an impairment under the requirements of the SSA listings.

functional capacity to perform light work activity" existing in the national economy, so long as she is not subjected to respiratory irritants or other environmental extremes that would trigger her asthma. Id.

### 2. The ALJ Failed to Apply the Treating Physician's Rule and Develop the Record With Respect to Ray's Weight Loss and its Connection to Her HIV-Positive Status

Ray argues that the ALJ erred by dismissing the significance of her weight loss and determining that her HIV-positive status did not qualify as an applicable impairment under SSA listings. Pl. Mem., 15-17. "Individuals with immune system disorders, including HIV infection, may manifest signs or symptoms of a . . . physical impairment" that qualifies for SSD benefits where there is "weight loss as a result of HIV infection that affects the digestive system, under [Listing] 5.00." 20 C.F.R. Pt. 404, Subbpt. P, App. 1 § 14.00(J)(2)(e). Listing 5.00 in turn covers, *inter alia*, "[w]eight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period." 20 C.F.R. Pt. 404, Subbpt. P, App. 1 § 5.08 ("Listing 5.08"). In other words, an SSD applicant can satisfy the regulations' requirements for a qualifying impairment on the basis of weight loss if it is causally related to HIV infection and results in a low enough BMI over at least a six-month period.

Ray asserts that she had the necessary BMI readings to meet these requirements. In her memorandum in support of her motion, Ray calculates various BMI figures based on her height and weight as noted in the record for certain dates: 17.33 when she filed her application for benefits in April 2011, as indicated by her height and weight listed on her disability report; 17.16 in June 2011 per Dr. Revan's measurements at her consultative examination; and 17.67 in October or November 2011, based on Ray's own recollection during her May 2012 hearing

21

testimony.  Pl. Mem., 16 (citing Rec. at 41, 115, 218).[6]  The Commissioner counters that Ray

cannot rely on her "inferred" BMI figures calculated from her self-reported and undated

disability application and post hoc hearing testimony.  Gov't Mem., 13-14.  The Commissioner

points to medical records from GDTC as more reliable sources, which state that Ray had a BMI

of 18.30 in April 2010 and 17.61 in March 2011.  Id. at 13 (citing Rec. at 194, 197).

Although the Commissioner is correct that Ray's self-reported BMI numbers are not a

reliable source of evidence, Ray's challenge of the ALJ's decision on this point nonetheless

reveals a fundamental legal error: the ALJ did not properly address the opinion of Ray's primary

physician and adequately develop the record to be able to make a finding as to whether Ray's

disability qualified as a listed impairment based on HIV-related chronic weight loss.  The ALJ

stated conclusively that, based on the Bellevue and GDTC records, Ray did not have "a history

of significant weight loss/wasting syndrome."  Rec. at 16.  The ALJ relied specifically on Ray's

remark during her consultative examination that she had lost ten pounds over ten years

(appearing to suggest that this weight loss was insignificant) and on Ray's hearing testimony that

she had "gained some weight."  Id.  By contrast, however, the ALJ made no mention of Dr.

Hoover's April 19, 2011 letter explicitly stating that Ray was "chronically underweight for her

height" and that throughout her treatment, Ray had "failed to gain notable weight."  Id. at 181.

The ALJ also did not acknowledge that Hoover had specified that Ray's "BMI fluctuates

---

[6]        None of these BMI figures were explicitly stated in the record before the ALJ, nor did the
ALJ calculate any BMI figures.  Rather, Ray has calculated her purported BMI by inputting her
noted weight and height into the appropriate formula as defined by the regulations.  Pl. Mem., 16
n.7 (citing 20 C.F.R. Part 404, Subpt. P, Appx. 1 § 5.00(G)(2) ("BMI is the ratio of your weight
to the square of your height.")).  Ray did not include a calculated BMI for her purported
October/November 2011 figure, instead including only her weight of "103 or 104 pounds."  Pl.
Mem., 16 (citing Rec. at 41).  The Court applied the formula above, assuming her height was
consistently the 64 inches cited in her memorandum, id., to arrive at the 17.67 figure.

between 17 and 18," putting Ray right on the cusp of the 17.5 BMI cut-off under Listing 5.08.
Id.

Despite the fact that she was identified at the hearing as Ray's primary physician, id. at
39-40, and, according to the records, managed Ray's HIV-treatment since at least 2010, see id. at
221, 223, 232-33, Hoover is not named once in the ALJ's decision.  Nor does the ALJ appear to
have considered Hoover's letter.  The Commissioner argues that the letter was not entitled to any
weight because it offers a conclusory statement on an issue reserved to the ALJ.  Gov't Mem.,
16.  It is indisputable that an ultimate finding about an applicant's disability as a legal matter is
the ALJ's to make, but to the extent that Hoover's letter identified a medical issue – Ray's
precarious weight – the treating physician's rule applied.  Thus, the ALJ was required, at the
very least, to acknowledge Hoover's treatment of Ray, and his failure to set forth any "good
reasons" for disregarding Hoover's warning about Ray's weight was clearly erroneous.  See
Halloran, 362 F.3d at 33 ("Here, it is unclear on the face of the ALJ's opinion whether the ALJ
considered (or even was aware of) the applicability of the treating physician rule."); accord
Burgess, 537 F.3d at 129 (listing factors ALJ must consider when not giving treating physician
controlling weight); Truesdale v. Barnhart, No. 03 Civ. 0063 (SAS), 2004 WL 235260, at *6-7
(S.D.N.Y. Feb. 6, 2004) (remanding where ALJ's opinion made "no mention" of "the three
treating physicians whose reports were readily available in the record").

Related to this error was the ALJ's failure to heed the obvious implication of Hoover's
letter that the record lacked conclusive information about Ray's weight.  It is true, as the
Commissioner notes, that two measurements of Ray's BMI in the medical records, taken
approximately a year apart in 2010 and early 2011, both showed that Ray had a BMI above the
17.50 threshold.  Gov't Mem., 13.  But the ALJ could not have reasonably relied only on these

two isolated measurements in light of Hoover's more recent warning in April 2011 about Ray's

weight fluctuations.  Indeed, during the hearing, the ALJ agreed with Ray's counsel's suggestion

that it would "be beneficial to . . . have some sort of statement from Dr. Hoover who is the

primary care physician in the context of HIV management." Rec. at 56.  Despite granting an

extension so that additional information could be obtained, the ALJ did not admit any follow-up

documentation into evidence.   Moreover, despite the fact that Ray indicated on her October

2011 "Claimant's Recent Medical Treatment" form that she had visited Hoover on four

occasions between November 2011 and April 2012, id. at 152, the record compiled by the ALJ

contains no reports from any of these visits.

 Given the paucity of precise data regarding Ray's weight, it was incumbent upon the

ALJ, as part of his duty to develop the record, to seek out this dispositive information.  "[E]ven if

the clinical findings [a]re inadequate, it [is] the ALJ's duty to seek additional information from

[the treating physician] *sua sponte*."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("[T]he

ALJ should have taken steps to supplement [the treating physician's] findings with additional

information.") (quoting Schaal, 134 F.3d at 505).  Hoover, upon request, could have readily

provided more details about Ray's weight fluctuations, including more recent BMI

measurements necessary to determine Ray's eligibility under Listing 5.08.

 In sum, more information was required for the ALJ to determine whether Ray's weight

loss was "a result of HIV infection." 20 C.F.R. Pt. 404, Subbpt. P, App. 1 § 14.00(J)(2)(e).

There is no explicit reference in the medical records stating that Ray's chronic weight loss is

caused by or otherwise related to her HIV.  However, as Ray points out, Hoover's April 2011

letter discusses Ray's problems with weight loss "within the context of her HIV impairment."

Pl. Mem., 16.  Further development of the record was necessary for the ALJ to clarify the

medical evidence on this point, and Hoover was the obvious source of information as to the exact relationship between Ray's weight loss and her HIV infection. See, e.g., Scott, 2010 WL 2736879, at *13-14 (ALJ must seek out treating physician's reports and resolve medical ambiguity); Toribio v. Astrue, No. 06 Civ. 6532 (NGG), 2009 WL 2366766, at *10 (E.D.N.Y. July 31, 2009) (remanding in part for ALJ's failure to clarify ambiguity in medical report). Consequently, in light of these deficiencies, the proper course is to remand the case to the ALJ so that he can develop the record more fully as to Ray's weight and its relationship to her HIV-status and properly evaluate Hoover's opinion on this issue as Ray's treating physician. See, e.g., Rosa, 168 F.3d at 82-83 (courts should remand where there are gaps in administrative record) (citing Pratts, 94 F.3d at 39).

### 3.  The ALJ Adequately Considered Ray's Raynaud's Disease and Was Not Required to Hear Testimony of a Vocational Expert to Determine Her Work Capacity

As a further basis to support her motion for judgment on the pleadings, Ray contends that the ALJ also erred at step five of the disability inquiry by applying the Grids, the SSA medical vocational guidelines, while ignoring the nonexertional limitations caused by her Raynaud's disease. Pl. Mem., 18-19.[7] While the Court recommends a remand given the ALJ's failure to apply the treating physician's rule and develop the record, as discussed above, in the interest of completeness it addresses this separate challenge as well.

Because Raynaud's disease places "extraordinary limitations on [the use of] her dominant right hand for reaching, handling, and feeling," Ray argues, the ALJ was required to hear the testimony of a vocational expert regarding what kinds of employment opportunities would, in

---

[7]  Ray does not challenge the ALJ's earlier, step three determination that her Raynaud's disease does not qualify as a listed impairment. The applicable listing requires "disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.04(B).

fact, be available to her. Id. The Commissioner responds that the ALJ adequately considered findings by both the consultative examination and the RFC Assessment that Ray retained the ability for light work even with her Raynaud's disease, which was adequately managed by medication. Gov't Mem., 21. Upon careful review of the record, the Court believes that the ALJ's decision to apply the Grids without the testimony of a vocational expert should not be disturbed.

There is no doubt that the effects of Raynaud's disease on Ray, including numbness to her right hand in the winter, qualify as a nonexertional limitation under the SSA's guidelines. See SSR 85-15, 1985 WL 56857, at *4 ("Nonexertional limitations can affect the abilities to reach; to seize, hold, grasp, or turn an object (handle)," as well as "[f]ine movements of small objects . . . requir[ing] use of the fingers to pick, pinch, etc."). However, the evidence does not indicate that these effects were of sufficient gravity to require the testimony of a vocational expert in lieu of reliance on the Grids alone. The Second Circuit has clarified that the nonexertional limitation must result in "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive h[er] of a meaningful employment opportunity." Bapp, 802 F.2d at 606; see also Perez v. Colvin, No. 13 Civ. 3713 (AJP), 2014 WL 2462992, at *23 (S.D.N.Y. June 2, 2014) ("[R]elying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations.") (citation omitted).

Ray's hearing testimony revealed that the numbness in her hand caused by Raynaud's disease forced her at times during winter months to take unpaid two hour breaks from work. Rec. at 50-51. Ray argues, correctly, that the ALJ was not permitted to consider such accommodations made by previous employers as part of his inquiry into her current work

capacity.  Pl. Reply, 3-4 (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803

(1999)).  Even without relying on such evidence, however, the ALJ correctly found substantial

support in the record that Ray's Raynaud's disease-related symptoms would not significantly

impact the range of light work that might otherwise be available to her.  Although Ray's medical

records consistently note her diagnosis of Raynaud's disease, they specify that she becomes

symptomatic only in cold weather and that she takes Nifedipine to control the disease's effects.

Rec. at 175, 231-33.  In December 2010, Ray reported that she protects her hands and feet in the

cold weather and that her extremities "do not become severely cold or painful."  Id. at 233.

Consistent with these findings, as observed by the ALJ, the June 2011 consultative examination

observed that Ray suffered from Raynaud's disease only during the winter and that she denied

any associated pain; a neurologic examination also found no sensory deficits.  Id. at 17, 217, 219.

The subsequent RFC assessment similarly found Ray to have no manipulative limitations.  Id. at

243-44.

     These findings do not indicate that her Raynaud's disease was of sufficient gravity to

preclude Ray from gaining access to meaningful employment opportunities.  Consequently, the

ALJ did not err in utilizing the Grids without resort to the testimony of a vocational expert.  See

Zabala, 595 F.3d at 411; Vargas v. Astrue, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *13

(S.D.N.Y. July 20, 2011).

## III.   CONCLUSION

     For the foregoing reasons, I recommend that Ray's motion for judgment on the pleadings

be granted to the extent that the case be remanded pursuant to sentence four of 42 U.S.C.

§ 405(g), and that the Commissioner's cross-motion be denied.  Specifically, I recommend that,

on remand, the ALJ should:

(1) Obtain treatment notes and other documentation from Dr. Hoover that elaborate on Ray's weight, in particular her BMI measurements for purposes of determining whether they satisfy the requirements of Listing 5.08;

(2) Obtain further clarification from Hoover concerning the connection, if any, between Ray's weight and her HIV-positive status; and

(3) Determine what probative value should be given to Hoover's opinion as to this issue and if it is not deemed to be controlling, provide good reasons for such a finding in accordance with the relevant factors under the treating physician's rule.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain.

FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: New York, New York
August 7, 2014

JAMES L. COTT
United States Magistrate Judge

29